419 So.2d 59 (1982)
Mary G. SMITH, Plaintiff-Appellee,
v.
MILLERS MUTUAL INSURANCE COMPANY, et al., Defendants-Appellants-Appellees, Third Party Defendants-Appellants-Appellees, and Defendant-Intervenor-Appellee.
No. 14931.
Court of Appeal of Louisiana, Second Circuit.
August 17, 1982.
Writ Denied November 5, 1982.
*60 Mayer, Smith & Roberts by Alex F. Smith, Jr., Shreveport, for defendant-appellant, Charles E. Mayfield, Individually and as the Administrator for the Estate of the minor, James W. Mayfield, On the Principal Demand.
Nelson & Achee, Ltd. by Roland J. Achee, Shreveport, for third party defendant-appellant, Charles E. Mayfield, Individually and as the Administrator for the Estate of the minor, James W. Mayfield, On the Third Party Demand.
Nelson, Hammons & Johnson by John L. Hammons, Shreveport, for plaintiffs-appellees, Mary Jo Smith Garland and Gillum William Smith, III, Children and Sole Heirs of Mary G. Smith.
Maynard Cush, Shreveport, for defendants-appellees, Paramount Agency, Inc. and Mortimer J. Lasseigne, Jr.
Lunn, Irion, Switzer, Johnson & Salley by Charles W. Salley, Shreveport, for defendant-intervenor-appellee, Firemen's Ins. Co. of Newark.
Cook, Yancey, King & Galloway by Charles G. Tutt, Shreveport, for third party defendants-appellees, Paramount Agency, *61 Inc., Mortimer J. Lasseigne, Jr., and Nat. Union Fire Ins. Co. of Pittsburgh, Pa.
Before HALL, JASPER E. JONES and NORRIS, JJ.
HALL, Judge.
Plaintiff, Mary G. Smith, filed this suit for damages against Charles E. Mayfield and his liability insurer, Millers Mutual, alleging that while she was walking across a street she was negligently struck and run over by a pickup truck driven by Mayfield's minor son, James Mayfield. Also named as defendant was Firemen's Insurance Company, plaintiff's insurer, who provided uninsured motorist coverage of $10,000. Charles Mayfield and Millers Mutual answered, denying negligence and pleading plaintiff's contributory negligence. Additionally, Mayfield filed a third party demand against the insurance agency which had procured the Millers Mutual policy, Paramount Agency, Inc., an officer of the agency, Mortimer J. Lasseigne, and their errors and omissions insurer, National Union, alleging third party defendants' negligence and breach of duty in failing to provide liability insurance coverage with higher limits than the $100,000/300,000 limits of the Millers Mutual policy and in failing to obtain a $1,000,000 umbrella policy requested by Mayfield. Third party defendants answered, denying liability. Firemen's Insurance Company, alleging payment of its uninsured motorist coverage limits of $10,000, intervened and sought recovery under its subrogation rights out of any recovery by plaintiff in excess of $150,000.
After trial, the district court found that the minor driver of the pickup truck was negligent, fixed plaintiff's damages at $235,623.96, and found no negligence or breach of duty on the part of the insurance agent. Judgment was rendered (1) in favor of plaintiff against Mayfield and Millers Mutual, in solido, for $100,000; (2) in favor of plaintiff against Charles Mayfield for $135,623.96; (3) rejecting Mayfield's third party demand; and (4) in favor of Firemen's Insurance Company against plaintiff recognizing its subrogation rights for $10,000 out of the amount recovered by plaintiff in excess of $150,000. Charles Mayfield appealed from the judgment against him on the main demand and rejecting his third party demand. Millers Mutual did not appeal and the judgment against it is final. Plaintiff, the third party defendants, and the intervenor neither appealed nor answered the appeals.
Plaintiff died while this case was pending on appeal and her heirs have been substituted as parties plaintiff.
Upon review, we find that the trial court correctly decided all factual and legal issues in its comprehensive written reasons for judgment, which we adopt and attach to this opinion as an appendix. Accordingly, the judgment of the district court is affirmed.
Appellant contends on appeal that the district court erred in finding James Mayfield negligent, in awarding an excessive amount of damages for future medical care, and in failing to find the insurance agency and its officer liable to the defendant Mayfield. Without repeating in detail the facts as found by the district court, we address the principal assignments of error.
Negligence
Briefly summarized, the facts of the accident as found by the trial court are as follows. After a homecoming parade at Haughton High School, James Mayfield was proceeding south on North Hazel Street near the school in his pickup truck. He stopped to talk to a friend, Jay Dupuy, who was headed north in his pickup truck. The trucks were stopped next to each other in such a position that the drivers looked back over their left shoulders in talking to each other out of their respective windows. There were numerous pedestrians walking along the side of the street. Haughton has no sidewalks or designated pedestrian crossovers.
Mary Smith, age 76, whose home is located on the east side of the street, with her son, Billy Smith, came to the edge of the street from her driveway with the intention of crossing the street to go to her daughter's *62 yard across the street. They looked for traffic and then started across the street. Mayfield ended his conversation with his friend and, without looking forward, let his foot off the brake at which time the truck moved forward and struck Mrs. Smith who was walking across the street. She fell to the street and the left front wheel of the truck passed over her legs. She sustained serious head injuries, bruises and contusions to the body, and serious injuries to both legs.
On appeal, appellant emphasizes that plaintiff has the burden of proving negligence by a preponderance of the evidence, and contends that the trial court erred in accepting the eyewitness testimony of three witnesses who said plaintiff was standing or walking at the time she was struck by the truck in light of inconsistencies and confusion in those witnesses' testimony. Appellant urges that the court should have accepted the testimony of James Mayfield that he looked forward before taking his foot off the brake and of Dupuy who testified that Mayfield looked forward after they finished their conversation, indicating that Mrs. Smith was not standing or walking in front of the truck when it moved forward and was out of sight, having fallen or fainted or having reached over to pick up a purse which she might have dropped. Appellant contends that the court erred in not accepting the opinion of its accident reconstruction expert, Dr. Barnwell, who, based primarily on the position of Mrs. Smith's body on the asphalt pavement with her legs behind the front wheel of the truck, expressed the opinion that Mrs. Smith was not struck by the truck but had fallen and was lying on the pavement at the time the truck moved forward and ran over her legs.
Considering all of the evidence in the record, we conclude that the trial court was not clearly wrong; in fact, the evidence establishes that the trial court was clearly correct. Arceneaux v. Domingue, 365 So.2d 1330 (La.1978).
Greg Johnson and Todd Richards, also Haughton High School students, were in an automobile leaving the school grounds. These disinterested witnesses testified that they saw the truck move forward and strike Mrs. Smith and that she was standing in front of the truck at the time it hit her. As argued by appellant there were several errors or inconsistencies in the testimony of these witnesses. Their testimony was inconsistent as to where they were seated in the car in which they were riding. One testified mistakenly that both pickup trucks were headed south. One was not sure whether Mrs. Smith was walking from east to west or west to east. Nevertheless, the trial court correctly accepted as credible their testimony as to the key fact in dispute in this case, that is, that Mrs. Smith was standing or walking in front of the truck when it moved forward. The witnesses were disinterested and were certain of this fact. Likewise, the trial court properly gave some consideration to the testimony of Billy Smith, plaintiff's 48-year-old son, in spite of his confusion and apparent diminished mental capacity and interest in the case. His testimony demonstrates he was able to understand and relate basic facts. He testified that as Mrs. Smith was crossing behind him, the driver of the pickup truck started up without looking and that Mrs. Smith had her hands in the air and hollered when the truck struck her.
Significantly, the doctors who treated Mrs. Smith after the accident testified that the severity and nature of her head injury and the bruises to both sides of the body would not likely have resulted from her fainting or falling to the ground prior to having been struck by the vehicle.
The testimony of Professor Barnwell is not convincing or persuasive and is highly speculative. Based on laws of physics Professor Barnwell was of the opinion that had Mrs. Smith been struck by the truck moving forward while she was standing up, her body would have been knocked forward and she would not have come to rest perpendicular to the truck with the lower half of her body under the truck and the upper half of her body extending left of the truck. Dr. Barnwell's testimony did not take into *63 account or did not accord sufficient weight to the nature of Mrs. Smith's injuries. It did not accord sufficient weight to the fact that the initial impact of the truck and Mrs. Smith could have been very slight, nor to whether Mrs. Smith was standing still or walking, nor to any evasive actions which might have been taken by Mrs. Smith if and when she saw the truck moving forward. The facts do not justify a conclusion that, for some reason, Mrs. Smith was lying on the pavement when the truck started moving forward.
It is established by a clear preponderance of all of the evidence in this record that Mrs. Smith was walking across the street, as she set out to do, when the truck moved forward and struck her. It matters not whether young Mayfield failed to look before taking his foot off the brake allowing the truck to move forward or whether he looked and did not see what he could and should have seen. His negligence, however slight, in allowing the truck to move forward and strike the pedestrian who was crossing in front of his stopped truck was the sole legal cause of the accident.
It should be noted that appellants do not urge their plea of contributory negligence on appeal. See Baumgartner v. State Farm Mutual Insurance Company, 356 So.2d 400 (La.1978); Widcamp v. State Farm Mutual Insurance Company, 381 So.2d 937 (La.App. 3d Cir. 1980); Hyrhorchuk v. Smith, 379 So.2d 281 (La.App. 3d Cir. 1979), modified 390 So.2d 497 (La.1980).
Future Medical Expenses
Appellant contends that the trial court erred in using the LSA-R.S. 47:2405 life expectancy tables in calculating the award for future medical expenses because of the plaintiff's poor physical condition at the time of trial which could be expected to adversely affect her projected life span. Cited in support of this argument are Norris v. Detroit United Railway, 193 Mich. 578, 160 N.W. 574, and Draisma v. United States, 492 F.Supp. 1317, which held that the use of life expectancy tables is disfavored where the plaintiff has a preexisting condition or disease which adversely affects his or her projected life span, since the tables are based on the lives of healthy persons. Also cited are Muller v. Lykes Brothers Steamship Company, 337 F.Supp. 700, affirmed 468 F.2d 951, and 29 Am. Jur.2d 1006, § 898 for the proposition that the probative value of mortality tables is weakened and in some cases destroyed by evidence of the ill health or disease of the person whose life expectancy is at issue. Appellant also notes that the validity of this argument in Mrs. Smith's case is borne out by the fact that she died while this case was pending on appeal, about three months after judgment was rendered.
Plaintiff's economic expert, Dr. Harju, testified it would take a present award of $206,441 to generate the amount necessary to provide the annual cost of private duty nursing at $20,475 per year for a life expectancy of 10.3 years, based on the United States Department of Health, Education and Welfare Vital Statistics 1977 Volume 2, § 5 Life Tables. The trial court expressly considered "the medical testimony as to the condition of Mrs. Smith", her age, and her life expectancy of 5.88 years under LSA-R.S. 47:2405, and awarded $50,000 for future medical care and expenses.
The life expectancy table was not the sole criterium upon which the trial court's award was based and was not used as a part of a precise mathematical formula in arriving at the award. The $50,000 award was substantially less than the amount which would have been arrived at under Dr. Harju's formula using the 5.8 years life expectancy. The trial court expressly took into account Mrs. Smith's condition at the time of trial which was obviously very poor. It would be entirely inappropriate to consider the fact that Mrs. Smith died for reasons not shown in this record after judgment was rendered and while this case was pending on appeal in considering whether the trial court judgment is correct. See Dark v. Brinkman, 136 So.2d 463 (La.App. 3d Cir. 1962). There is no evidence as to what medical expenses were actually incurred after the judgment was rendered; whether they were more or less than the amount awarded.
*64 We find no abuse of discretion by the district court in its award for future medical care and expense.
Liability of the Insurance Agent
In his third party demand against Lasseigne and Paramount, Mayfield alleged Lasseigne, his insurance agent, was negligent in failing to recommend higher limits than the $100,000/300,000/25,000 provided by the Millers Mutual policy, in failing to advise him of the availability of a $300,000 single limit policy, and in failing to secure a $1,000,000 umbrella policy after being requested to do so. The evidence at trial as to what coverage Mayfield requested, what coverage Lasseigne advised Mayfield he had, what recommendations Lasseigne made as to liability limits, and what coverage Mayfield thought he had was in sharp conflict.
In a credibility call, the trial court found that there was no reason why Mayfield, as an educated, experienced businessman who had received copies of his policy each year and paid the premium, could not tell what limits he had. The court found that appellant had not proven that he ever asked for more coverage than he received or that Lasseigne ever gave him reason to believe that he had more or any different coverage than that requested. There was no action on the part of Lasseigne which would have justified Mayfield in reasonably assuming he was covered to the extent of $300,000. These factual determinations by the trial court are supported by evidence, are not clearly wrong, and will not be disturbed.
Appellant contends on appeal that the trial court erred in refusing to allow into evidence a deposition of Lasseigne which appellant contends cast doubt upon his credibility. The deposition, which is in the record as an offer of proof, has been reviewed by this court and we find no inconsistent or contrary statements by Lasseigne which cast doubt upon the trial court's factual findings.
The authorities relied on by the trial court in finding that the insurance agent did not breach any duty owed to the appellant were correctly analyzed and applied to the facts of this case. These authorities essentially hold that an insurance agent is responsible not only for his unfaithfulness but also for his fault or neglect. LSA-C.C.P. Art. 3003; Maclan Services Company, Inc. v. Louisiana Companies, 351 So.2d 827 (La.App. 1st Cir. 1977); Walker v. Fontenot, 329 So.2d 762 (La.App. 1st Cir. 1976). "An insurance agent who undertakes to procure insurance for another owes an obligation to his client to use reasonable diligence in attempting to place the insurance requested and to notify the client promptly if he has failed to obtain the requested insurance. The client may recover from the agent the loss he sustains as a result of the agent's failure to procure the desired coverage if the actions of the agent warranted an assumption by the client that he was properly insured in the amount of the desired coverage." Karam v. St. Paul Fire & Marine Insurance Company, 281 So.2d 728 (La.1973); Kieran v. Commercial Union Insurance Co. of N. Y., 271 So.2d 889 (La.App. 4th Cir. 1973). "In order to recover for loss arising out of the failure of an insurance agent to obtain insurance coverage, the plaintiff must prove: (1) an undertaking or agreement by the insurance agent to procure insurance; (2) failure of the agent to use reasonable diligence in attempting to place the insurance and failure to notify the client promptly if he has failed to obtain the insurance; and (3) the actions of the agent warranted an assumption by the client that he was properly insured." Porter v. Utica Mutual Insurance Company, 357 So.2d 1234 (La.App. 2d Cir. 1978); Redmond v. National Union Fire Insurance Company, 403 So.2d 810 (La.App. 2d Cir. 1981).
In sum, the evidence adduced at trial shows that Lasseigne discharged his duty as agent to Mayfield, i.e., he procured the $100,000/300,000 insurance requested by Mayfield.
Appellant complains of the trial court's finding that Mayfield knew or should have known the limits of his automobile liability insurance, noting the complexities of insurance policies and the necessity for an insured *65 to rely on his insurance agent to provide required coverage.
The stated liability limits of an insurance policy is not a complex matter or provision. Although an insured should not be held to have read and understood the complex and often confusing intricate detailed provisions of an insurance policy, an insured should be held to have read and know the liability limits of his automobile insurance policy, plainly disclosed on the face of the policy, particularly where, as here, the insured is an educated, experienced businessman, signed an application showing the policy limits, and has received copies of his policy each year for several years with advice to review it. See Kieran v. Commercial Union Insurance Co. of N. Y., supra; and Porter v. Utica Mutual Insurance Company, supra.
Counsel for appellant urges in brief that an insurance agent's duty extends beyond merely obtaining the insurance coverage requested by the client and requires that the agent who holds himself out as a professional review his client's coverage and recommend the forms of insurance best suited to the client's needs, including adequate monetary limits. Counsel refers the court to the Code of Ethics adopted by the National Association of Insurance Agents (NAIA), of which Lasseigne was a member, and to several commentaries. See "Responsibilities of Insurance Agents and Brokers" by Bertram Harnett (Matthew Bender), Vol. 1, § 3.09, pp. 3-15; 22 Drake L.Rev. 738, "Liability Considerations Concerning Insurance Agents and Brokers" by Phil C. Redenbaugh; 43 Am.Jur.2d 229, § 173; Insurance Law Journal, December 1979, pp. 690-691, "Professional Malpractice: Welcome Insurance Agents and Brokers" by David S. Oppenheim.
The trial court noted that no case has been cited that places a duty on an insurance agent to advise what limits should be carried by an insured. The only case, state or federal, cited by the parties which has dealt with the issue is Fleming v. Torrey, 273 N.W.2d 169 (S.Ct. of South Dakota, 1978) where the court rejected the argument and held that there is no one right answer to the question of what is a safe or adequate liability limit on a vehicle.
Even accepting the broad duty as articulated by appellant (and we recognize that an insurance agent's duty to his client can be greater than merely the procuring of requested insurance, depending on what services the agent holds himself out as performing and on the specific relationship and agreements between the particular agent and client) there was no breach of that duty because Lasseigne on at least two occasions recommended higher limits, which were rejected by Mayfield. On several subsequent occasions Lasseigne either asked Mayfield if he wanted to increase his limits or if he wanted to make any changes in his policy, to which Mayfield expressed no interest. From the time Mayfield started doing business with Lasseigne his insurance limits were increased from $5,000/10,000 to $100,000/300,000 at the time of the accident, on Lasseigne's recommendations. Limits of $100,000/300,000 are substantial. The only kind of policy that would provide completely safe coverage and the best possible protection would be a policy without any limits. There is nothing in this record to suggest what would be the proper and adequate limits of liability that an insured should carry. The trial court correctly held that there was no breach of duty by the insurance agent with regard to recommending higher limits.
On appeal the appellant, while continuing to urge error in the trial court's determinations of fact and law on the issues previously discussed, zeroes in on and strenuously urges his contention that the insurance agent breached the duty owed to his client in not advising him specifically of the availability from Millers Mutual of $300,000 single limit coverage, which appellant previously had with another company, and in having an endorsement providing split limits added to Millers Mutual's standard form policy which called for single limit coverage. Appellant seems to pose this contention as being separate and distinct or in addition to the contention that the agent had a duty to his client to recommend higher limits.
*66 The facts relevant to this issue are as follows. Mayfield started doing business with Lasseigne in 1971 at which time Mayfield had been carrying insurance on his automobiles with limits of $5,000/10,000. At Lasseigne's suggestion the limits of his policy were increased to $10,000/20,000. In 1974 Lasseigne recommended that Mayfield obtain a package policy from Travelers which provided workman's compensation, general liability, and automobile liability coverage with single limit of $500,000. Mayfield wanted lower limits and Lasseigne obtained, with Mayfield's approval, the package policy from Travelers with $300,000 single limit for the 1974-1975 year. At the end of the policy year Travelers refused to renew the policy and when Lasseigne determined a similar policy was not available, he recommended to Mayfield an automobile policy with $250,000/500,000 split limits. Mayfield wanted lower limits so Lasseigne, pursuant to an application signed by Mayfield requesting $100,000/300,000/25,000, obtained a policy from Millers Mutual with those limits for the year 1975-1976. Based on the original application, the Millers Mutual policy was renewed for the years 1976-77, 1978-79, and 1979-80 with the same limits.
Each year the renewal policy, showing the $100,000/300,000/25,000 limits, was sent to Mayfield with a letter from Lasseigne asking Mayfield to review the policy and notify him if there should be any changes. Each year at renewal time Lasseigne asked Mayfield if he wanted to change or increase his coverage and Mayfield expressed no interest in doing so. Lasseigne made no further specific recommendations as to insurance limits and did not advise Mayfield specifically of the availability of single limit coverage.
In 1978 Millers Mutual changed the form of its business auto policy. Previously, the printed form provided for split limits and could be changed by endorsement to provide single limit. After the change, the printed form provided the single limit and could be changed by endorsement to provide split limits, which was done in Mayfield's case. Single limit coverage was available from Millers Mutual from at least 1977 on, regardless of the printed form. Lasseigne had three or four customers who had the single limit policy and knew of its availability. There is evidence in the record showing that there was a relatively insignificant difference in the annual premium between the $100,000/300,000 split limits and either the $250,000/500,000 split limits or the $300,000 single limits.
In spite of the skillful and forceful arguments of counsel for appellant we are unable to perceive the difference between the contention that the agent had a duty to recommend higher limits in general and the contention that the agent had a duty to advise of the availability of the $300,000 single limit specifically. The single limit as opposed to split limits was not significant to Mayfield prior to this accident, as shown by his testimony that he was not aware that he ever had a single limit policy previously. It is true that the $300,000 single limit would provide higher coverage than the $100,000/300,000/25,000 split limits in most situations and particularly as applied to this case. However, so would $250,000/500,000 or any other higher split limits.
The contention that the insurance agent was somehow at fault in causing the endorsement providing split limits to be attached to the printed form of policy is without merit. The change in the printed form used by the insurance company in writing business auto insurance is entirely inconsequential. Either single limit or split limit coverage was available both before and after the change in 1978. It matters not whether the requested amount of coverage was stated in a printed form of policy or printed form of endorsement. The policy issued here provided the coverage and limits originally applied for by the insured through the agent, and required no further specific authorization by the insured.
There was no breach of duty on the part of the insurance agent which would make him liable to the insured for that part of the judgment in favor of plaintiff that exceeds the amount of the insured's policy limits.
*67 Conclusion
For the reasons assigned in the reasons for judgment of the trial court and in this appellate opinion, the judgment of the district court is affirmed.
Affirmed.
 APPENDIX
 MARY G. SMITH : NO. 53,819
 VERSUS : 26TH JUDICIAL DISTRICT COURT
 MILLERS MUTUAL INSURANCE :
 COMPANY, ET AL : BOSSIER PARISH, LOUISIANA

OPINION
On March 25, 1980, Mary G. Smith brought this suit against Charles E. Mayfield, individually, and as the administrator of the estate of his minor son, James W. Mayfield, and their liability insurer, Millers Mutual Fire Insurance Company of Texas (referred to in petition as Millers Mutual Insurance Company) claiming $1,272,511.46 in damages for injuries that she sustained as a result of being struck as a pedestrian on October 12, 1979, by a 1979 GMC pickup truck being operated by young Mayfield. The Millers Mutual policy contained limits of $25,000.00 for property damage, of $100,000.00 for the bodily injury or death, or both, of any one person in any one accident, and of $300,000.00 for the bodily injuries or deaths, or both, of more than any one person in any one accident, and the plaintiff also joined her own uninsured motorist insurer, Fireman's Insurance Company of Newark, New Jersey.
The petition contends that plaintiff was crossing North Hazel Street in Haughton, Louisiana, from its east side to its west side; that while in the process of negotiating the street at this point, it was necessary for her to walk in front of a pickup truck being operated by Jimmy Mayfield and which was stopped in the southbound lane facing in a southerly direction; that when plaintiff was standing erect in front of the truck, the driver allowed it to roll or move slowly forward until it struck the plaintiff and knocked her to the asphalt surface. Further that, after plaintiff was on the surface of the street, the left front wheel rolled over her legs and came to a stop immediately thereafter.
The petition alleges that Jimmy Mayfield, who at the time was fifteen years of age and resided with his parents near Princeton, Louisiana, was at fault or negligent in that he did not look in front of him before allowing his vehicle to move forward, and that had he looked he would have seen plaintiff.
Defendant Charles Mayfield filed an alternate third party action on July 24, 1980 against his former insurance agent, Mortimer J. Lasseigne, Jr. and his employer, Paramount Agency, Inc., a corporation in which he was also a stockholder and an officer. Later, in an amended third party petition, National Union Fire Insurance Company of Pittsburgh, Pennsylvania, was named as an additional third party defendant as the errors and omissions insurer of Mr. Lasseigne and Paramount Agency, Inc. to the extent of $100,000.00. In the original and amended third party petitions it is alleged that Mr. Lasseigne and Paramount were negligent in failing to inform Mr. Mayfield that combined single limits could have been obtained in 1978 and 1979 under the business-auto policy form, and in telling him in 1978 that a one million dollar umbrella policy could not be procured. All of these allegations were denied by the third party defendants.

THE PRINCIPAL DEMAND
Plaintiff Mary G. Smith sustained such severe injuries that she was unable to appear at the trial or to testify by deposition. The Court does not have the benefit of her testimony.
*68 James W. "Jimmy" Mayfield, Jr. was the first witness and was called under cross-examination by plaintiff.
Mayfield testified that he was travelling south on Allentown Road (also known as North Hazel Street) in order to talk with a friend of his, Jay Dupuy, who was going in the opposite direction in his pickup truck. The cab of Dupuy's truck was about five feet past Mayfield's so it was necessary for Mayfield to look back over his left shoulder out of the driver's window in order to converse with Dupuy. Mayfield testified that there was a homecoming parade that day; that numerous cars were parked in the vicinity; and that lots of kids were leaving from school, walking up and down the side of the road. (Trans. pg. 22-23)
"Q Lots of kids walking up and down the side of the road and so forth?
A Yes, sir.
Q All right, does your truck have automatic transmission?
A Yes, sir.
Q And you had your truck in drive while you were stopped?
A Yes, sir. Yes, sir.
Q Presume you had your foot on the brake?
A Yes, sir.
Q Now, you were stopped there talking with Jay, you noticed a number of different people walking around, different school kids and so forth, near the vicinity of your truck, did you not?
A Yes, sir.
Q In fact, you sawI believe you saw Mr. Billy Smith, plaintiff's son, on the side of the road also, didn't you?
A Yes, sir.
Q All right. Where was he located?
A On the east side of the road.
Q That would be in front of his mother's home?
A Yes, sir.
Q Did you see Mrs. Smith?
A No, sir.
Q Now, on your vehicle, if you have your vehicle in drive with the motor running, and take your foot off the brake, will your truck move?
A Yes, sir; just barely.
Q It will go forward, without having to put your foot on the accelerator?
A Right.
Q Now, when you andand Jay Dupuy were talking, at no time did you put your vehicle in park, did you?
A No, sir.
Q Now, do you remember running over Mrs. Smith?
A Yes, sir.
Q Would you just briefly tell me what happened?
A After we got finished talking, turned around and looked, didn't see anybody in front of me, took my foot off the brake and rolled about three feet, I felt a little bump, I looked out the window and saw her laying on the ground.
Q Under your truck?
A Yes, sir.
Q And she was behind the left front wheel, right?
A Right.
Q With her headwas she on her back or her stomach?
A I don't remember.
Q What time of day did this happen?
A You mean the time?
Q Yes.
A About five minutes till three.
Q What kind of weather conditions?
A It was clear.
Q Was there anything to obstruct your view?
A No, sir.
Q All right. After you ran over Mrs. Smith, what did you then do?
A Got out, put my truck in park, got out and walked over there. I didn't do nothing."
*69 Later in the trial on re-cross examination Jimmy Mayfield stated that Officer Paul Rousell was either lying or in error in his testimony. (Trans. page 234)
"Q Mr. Mayfield, did you state to Officer Rousell that you let off the brake in preparation of proceeding southbound on Allentown Road without looking up to see if the road was clear?
A I didn't say that.
Q You deny that statement?
A Right.
Q If Officer Rousell were to say that you made that statement, he would either be lying or in error?
A Right."
Plaintiff's next witness was Officer Paul Rousell, who at the time of the accident was employed by Louisiana State Police as a helicopter pilot for Region Three North. Officer Rousell stated that he had been doing accident investigations for five years. He had three-weeks course in accident investigation at the Academy and OJT for three months on the road. He admitted that this was his first auto pedestrian accident investigation.
At the time Officer Rousell received notice of the accident he was at a shift meeting. He proceeded to the accident scene and testified that when he arrived, it was apparent that the plaintiff had a head injury, a broken right leg, damage to the left leg, minor cuts with visible blood, and that she was unconscious. He assisted in giving first-aid in order to stabilize her to the hospital. He was unable to talk to Mrs. Smith at the scene and had not talked to her since the accident. In conducting his investigation he stated that he talked to a Todd Richards and O'Neal Summers and several other people at the scene but he did not know their names. (Trans. pg. 30-31)
"Q Now, did you have an occasion to discuss the accident with the driver of the vehicle?
A Yes, sir, I did.
Q And was that James W. Mayfield?
A Yes, sir, it is.
Q Did he tell you what happened?
A Yes, sir, hehe gave me his statement as to what occurred?
Q What did he first tell you?
A To tell you the truth, Mr. Hammons, I don't remember what his exact statements were to begin with; later, I brought up some information and came to a conclusion that he concurred with, but to remember his exact statementlet me think a second. He advised me he was talking to a friend of his and proceeded to pull off, felt the bump, and then felt the front of the vehicle lift up and then he observed Mrs. Smith on the ground.
Q Now, you said that you arrived at certain conclusions from your investigation
A Yes, sir.
Q did you inform him of what those conclusions were?
A Yes, sir, I did.
Q Did he then concur with those conclusions?
A He did, sir."
And at page 34 of the transcript:
"Q Officer Rousell, what did Jimmy Mayfield say to you after you informed him about your conclusions?
A He agreed that that is probably what occurred.
Q And what did you tell him that he agreed to?
A Okay. I explained to Mr. Mayfield that what had occurred in my opinion. Which is what we're out there to do. Find out what happened in an accident. He was talking to his friend, he decided to leave the scene where he was talking to his friend, let his foot off the brake, the vehicle began moving before he looked up, he felt a bump, at that time, he looked up the second bump occurred and here's Mrs. Smith laying on the ground. He said, yes, sir, that's probably what happened."
*70 The next witness called by plaintiff was David Reiling, a student at Haughton High School who was in the vicinity at the time of this accident. He testified that he saw the Mayfield and Dupuy vehicles stopped in the middle of the street, side by side, headed in opposite directions. He further stated that he saw plaintiff and her son, Billy Smith, walk from their home on the east side of the street, out of their driveway to the edge of the street, and stop, "like they were looking for cars." He testified that he turned away after that.
"Q When did you next see either of the two of them?
A After the car had hit her.
Q All right, who did you then see?
A Well, I saw here in the road and the truck stops.
Q Okay, where was she in relationship to the truck?
A She was behind the front left wheel.
Q Was she lying on the ground?
A Yes."
Greg Johnson, another student at Haughton High School, testified that he was in a vehicle with Todd Richards and his mother and that they were turning onto Allentown Road headed southbound from the Haughton High School Gymnasium, approximately 210 feet north of the point of impact. He stated that he was on the backseat and that Todd's mother was driving. He further testified that he saw the Mayfield and Dupuy vehicles stopped in the road and that it appeared that the two of them were talking to one another. (Trans. pg. 72).
"Q Did you seetell us what you saw after you first saw the two trucks stopped in the road?
A I see the lady and she was at the edge of his truck and then, like he eased off the brake or something, hit herrolled forward and hit her."
And at Page 73 of the transcript:
"Q Okay. Now you stated that you saw her in the middle of the road. Was shewhat was she doing in the middle of the road?
A I guess she was crossing.
Q All right, was she jumping up and down, running, walking?
A No, she was just walking.
Q Across the road?
A Right, yes sir.
Q Could you tell what direction she was walking in?
A Uh
Q Which way was she going?
A She was going to the left from where, you know, from where I was.
Q Okay. Now, did you see the truck actually hit her?
A Yes, sir.
Q What was her position or what was she doing as the truck hit her?
A I justI saw her fall when it hit here (sic) and it rolled over her. She was between the wheels.
Q Okay, you saw the truck roll over her?
A Yes, sir."
Under cross-examination Greg Johnson maintained his position that plaintiff was standing up and walking across the road when she was struck by the Mayfield vehicle and that it appeared that Mayfield had let off the brake just prior to impact. (Trans. pg. 83).
"Q Well, let me ask you this. You did give a statement about this accident date November 24th, 1980? Do you recognize that statement?
A Yes.
Q You do say in that statement that James let off the brake and rolled forward and hit the elderly woman, is that right?
A Right.
Q But you really don't know
A I don't know.
Q It's just a conclusion on your part, isn't it?
A Well, that's what it looked like. I don't know."
(Trans. pg. 84)
"Q You did say that you don't know whether she did or did not stoop *71 down to pick up her purse before the accident?
A Well, I was saying that she was standing up when she was hit."
Todd Richards, also a student at Haughton High School, testified that he was driving a vehicle with his mother and Greg Johnson. He stated that his mother was in the middle and that Greg Johnson was on the passenger side in the front seat. He testified that he was in the gym parking lot preparing to turn south and that he saw the impact between the Mayfield truck and plaintiff. (Trans. pg. 97-98).
"Q Now, what did you see with regard to the accident?
A Okay, I looked back to the right to make sure, you know, that it was clear to pull out and when I looked back I saw, you know, someone get hit.
Q By what?
A By a truck.
Q At that point in time, did you know who the pedestrian or who the person was that was hit?
A No, sir, I did not.
Q Did you see the actual impact between the truck and the person?
A Yes sir.
Q All right. What position was that person in when she was hit by the truck?
A She was standing up.
Q After the impace (sic), what happened to her body?
A When the truck hit her, she kind of threw her arms back and she just fell to the ground then.
Q Did thewhat did the truck do?
A It was so far off, I couldn't tell. It did stop though. The truck did stop."
Under cross-examination Todd maintained his position. (Trans. pg. 97-98)
"Q Did you see the bumper of Jimmy Mayfield's truck come in contact with the pedestrian?
A No sir, I just saw about the corner of his truck hit the pedestrian.
Q What corner?
A It would be the left front."
G. W. "Billy" Smith, III, son of plaintiff, testified that he and his mother left their home to go across the street to the home of his elderly aunts, Mrs. R. V. Kerr and Mrs. A. S. McDade, Sr.
The pertinent part of his testimony that corroborates that of plaintiff's other eye-witnesses: (Trans. pg. 105-106).
"Q Okay. Now, when you left your home were you with your mother?
A Yes.
Q All right, which door did you exit from?
A We came out the carport door.
Q Does that led (sic) into a circular driveway?
A That is correct.
Q And how did you proceed toward Mary Jo's house from that circulur (sic) driveway?
A Well, we went out of theI went out of the door, went to the first drive where you come in the circular drive and
Q Is that the southern most corner of the drive?
A That's right.
Q Okay.
A And I stopped.
Q Was your mother with you?
A Not at the time, she wasn't.
Q All right.
A And I waited for her to come.
Q All right. Once she caught up with you, did you and she then proceed on toward the street?
A No, notwhen she got there we didn't. Traffic was very heavy and we stopped to check the traffic.
Q Where were you with relationship to the pavement of the road, where did you stop?
A At the edge.
Q Were you still in your yard?

*72 A Yes.
Q Were you in the driveway?
A Yes.
Q When you stopped, what did you do?
A When I stopped, as I said, we were checking the traffic to see before we crossed the road.
Q Did you see any vehicles stopped in the road?
A Yes, I certainly did.
Q And could you describe what vehicles you saw and where they were located?
A There were two trucks side by side.
Q All right, were they to your left or to your right?
A In front of me.
Q Were they moving or were they stopped?
A They had stopped.
Q Did you recognize the drivers of either of the vehicles?
A No, I did not.
Q Could you tell what the drivers of either of the vehicles were doing?
A They had stopped and they were talking to one another."
(Trans. pg. 107)
"Q When you got across, what did you then do?
A I turned around to see if mother was coming.
Q All right, did you see your mother?
A Yes.
Q What did you then see?
A Well, when I turned around to see if she was coming, that's when the young man in the truck decided to start up.
Q All right. When you first saw here (sic), what was she doing?
A When I first
Q When you turned around?
A When I turned around, she had her hands up in the air and she was hollering.
Q And did you see the impact between her body and the truck?
A Yes, he never looked.
Q Didwhat happened to her body?
A He hit her right in the middle of her chest and when he did, it knocked her body up in the air and it fell to the asphalt."
Mr. Smith is forty-eight years of age and has never been employed. Under cross-examination he appeared confused and unable to understand simple questions necessitating a bench conference. However, he maintained his position that his mother was walking in front of the Mayfield truck when she was hit. (Trans. pg. 132-133).
"Q And you saw her walking?
A I did.
Q And then you saw her throw her hands up?
A When the truck was coming near her, when the young man accelerated his truck, was coming toward her, she threw up her hands.
Q Where was her purse when she threw up her hands?
A It was on her arm.
Q So, during the time that you crossed from one side of the road to about five feet into Mary Jo Garland's driveway, you (sic) mother had crossed just half of the road?
A That's right.
Q And where was she in ralation (sic) to the pickup that eventually hit her at that point?
A She was in front of it.
Q Do you know how far in front of it?
A Well, I'd say in the middle of it.
Q And her purse was where?
A On her arm.
Q You particularly recall noticing her purse?
A Yes.
Q Now, when the truck hit her, was she continuing to face Mary Jo Garland's house or was she facing the pickup truck?
A She was facing my sister's house.

*73 Q And what part of this pickup truck hit your mother?
A The wheels hit her. When it hit her, it was the radiator part of the truck that hit her in the chest, and knocked her up in the air.
Q Up into the air?
A Yes, it did.
Q Did she get up above the pickup truck?
A Almost and then she hit pavement.
Q Pavement?
A Yes.
Q To the side of the pickup?
A As I said when he hit her in the middle of her chest, it threw her up and she hit the pavement.
Q But did she hit the pavement in front of the truck or beside the truck?
A Yes.
Q Front?
A In front of the truck."
In addition to Jimmy Mayfield defendants called as witnesses Albert Joseph Dupuy, III, referred to throughout the testimony as "Jay Dupuy"; Professor Joseph H. Barnwell, who was accepted by the Court as an expert in reconstruction of auto-pedestrian accidents; and Mrs. C. S. McIntosh, a retired Registered Nurse.
Jay Dupuy is eighteen years of age and lives with his parents in Haughton and at the time of the trial was employed by Calumet Oil Refinery in Princeton. Prior to the accident, he was talking to Jimmy Mayfield on the Allentown Road, which is also known as North Hazel Street. Prior to stopping his truck to talk to Jimmy, Mr. Dupuy had been headed north toward the Haughton High School Gymnasium. They stopped, rolled down their windows and talked for a few minutes. Mr. Dupuy's description of what happened when their conversation was terminated is seen as Tr. 197 and is as follows:
"Q All right, now whentell the Court, if you will, what Mr. Mayfield did from the time that the conversation ended until his truck started forward?
A Well, when we got through talking he turned around and then his truck started moving after he turned around.
Q All right now, when you say his when he turned around, his head would have been facing in what direction?
A A head, forward.
Q You mean toward the hood of the car?
A Yes, toward the front of the truck.
Q All right, and then what happened after that?
A Well, I guess he let off the brake.
Q Then after that occurred, what did you do?
A Well, after that I went on."
The next witness called by defendant was Mrs. C. S. McIntosh, who lives on Highway 80 near Princeton, Louisiana, and has known plaintiff, Mary Smith, since 1946. Mrs. McIntosh attended church and Sunday School with plaintiff at Haughton Methodist Church, and she also associated with plaintiff in the activities of the Eastern Star. She was interrogated as to whether she had had an occasion to see plaintiff a short time prior to the accident, and she responded at Tr. 214 as follows:
"Q All right. Now, after the Sunday School class was dismissed that day, did you have occasion to talk to Mrs. Smith?
A Well, I was across the room and I heard her say, I have had a blackout.
Q All right. Now, I believe that you are a registered nurse?
A Yes sir, retired."
Under cross-examination she responded at Tr. 216-217 as follows:
"Q During the time that you knew Mrs. Smith before this accident occurred, before she was hurt, could you tell us what her general physical and mental condition was as far as you knew?

*74 A She, as I say, she appeared to be in perfect health and she was very active in church, in the Eastern Star and the UDC. I do not belong to the UDC, but she was very active.
Q There have been some discussion about some statement that you overheard her say about a blackout. Did you ever see her blackout or faint or anything?
A No sir, no sir.
Q Before this accident happened, did you ever see her have any type of physical or mental disability?
A Well, no, not disability. She had a dizzyness and asked me to take her blood pressure, because she thought it might be her blood pressure. I took her blood pressure and it was a good blood pressure. A hundred and thirty over eighty.
Q Okay, when was that?
A It was months before that. I don't it wasI can't remember, but it was quite a while. It was quite a while. Am I talking to loud?"
Professor Joseph H. Barnwell heard the testimony of the witnesses as to the liability aspect prior to giving his testimony and he had also read the deposition of Dr. C. G. McAlister and Dr. J. V. Hendricks. He had gone to the scene on two occasions and inspected, photographed and measured the truck driven by Jimmy Mayfield at the time of the accident. He studied the police photographs, obtained the weight of Mrs. Smith and had the weight of the Mayfield truck. Based on principle of physics and mathematics he offered testimony and used a scale model of the truck and a pedestrian (D-14) to demonstrate what would happen to a pedestrian's body if struck by a truck or automobile.
A summary of Professor Barnwell's testimony appears at Tr. 272 as follows:
"Q Now, Professor Barnwell, in your opinion could Mrs. Smith have been standing erect in front of the truck, crossing from either direction, one side to the other, and been struck by the front bumper of that truck or the front of that truck and ended up in the position in which she was found after this accident?
A I don't believe so.
Q And tell us why?
A Because I think she would have been knocked forward and the truck would have passed directly over her. I don't think she would have had time to get out and around in the position she was run over.
Q All right now, approximately how far would Mrs. Smith's body have been from the front bumper of the truck after the accident?
A That's a little betterapproximately four feet."
And his opinion at Tr. 273:
"Q In your opinion, would it be possible for the front of the truck to hit a pedestrian like this and the pedestrian end up so that the truck would run over both wheels in that distance? Both legs, I mean, both legs.
A Not from afrom hitting her in front of the truck, I don't thinkI think she would have been knocked forward and the truck would have passed directly over her.
Q If it did not happen that way according to your opinion Professor Barnwell, how do you think it did happen?
A I think she fell down and was in that position and got run over."
Defendants contend in their brief that due to the conflicting testimony of the teenagers, Greg Johnson and Todd Richards, and the confusion of Billy Smith, that their testimony should be disregarded. Defendants further contend that an admitted error by Officer Rousell in measurement of the distance the Mayfield truck travelled on his report and his failure to list all of the witnesses or to interview some, makes his investigation suspect. Defendant would have the Court accept the testimony of his two teenage witnesses and the opinion of Professor Barnwell.
*75 G. W. "Billy" Smith, III and Jimmy Mayfield obviously have an interest in this case. The accident could have happened as astute counsel for defendants contend. However, despite the inconsistencies as to the seating in the Richards car and their testimony as to the direction the truck of Dupuy was headed, Greg Johnson and Todd Richards were disinterested witnesses who were unwavering in their testimony that the Mayfield truck struck Mrs. Smith while she was walking.
Billy Smith amid all his confusion did not waiver from his statements that Mrs. Smith was standing when hit and that Mayfield was looking back talking to Jay Dupuy.
Officer Rousell was investigating an accident which required that his immediate attention be given to Mrs. Smith until she was placed in an ambulance. Despite any shortcomings of his investigation he arrived at certain conclusions as to what happened and as these conclusions varied with the first version given by Jimmy Mayfield, he stated his conclusions to young Mayfield who at that time concurred.
In Baumgartner v. State Farm Mutual Insurance Company, 356 So.2d 400 (La.1978) the Louisiana Supreme Court established an extremely high duty of care on the part of a motorist to avoid injuring a pedestrian. In that regard the court eliminated contributory negligence of the pedestrian as a defense to the liability of the motorist and established a strict liability concept to be applied in motorist-pedestrian accidents.
"It is well settled in our jurisprudence that the first duty of those operating motor vehicles is to keep a sharp lookout ahead to discover the presence of those who might be in danger. Rottman v. Beverly, 183 La. [947] at 955,165 So. [153] at 156. `... (W)hat they can see they must see and in legal contemplation they do see; ... their failure to see what they could have seen by the exercise of due diligence does not obsolve them from liability.' Jackson v. Cook, 189 La. [860] at 868, 181 So. [195] at 197.
"... Perhaps these courts had in mind the fact that in motor vehicle-pedestrian cases there is lacking a `mutuality of risks.' That is, the operator of a dangerous instrumentality, such as a motor vehicle, creates a great risk of injury to the life and limb of others. Thus he owes a duty to the public to protect it from that danger. The pedestrian, on the other hand, endangers himself only; therefore, his duty is owed primarily to himself. The motorist runs small risk of harm, physical or financial, from a pedestrian's negligence.
"Since the operator of a motor vehicle is aware that he could meet many emergencies in which pedestrians will not always act prudently and will sometimes be found in perilous situations, he should have the added burden of keeping the roads safe even for those who are negligently caught off their guard. Further, where injury results, the burden should fall on the motorist who, with the exercise of care reasonable under the circumstances, saw or should have seen the impending peril and had, at that moment, the opportunity to avoid it. 356 So.2d 400, 405.
"Accordingly, we hold that the doctrine of `last clear chance' has no application in absolving a motorist from liability when he negligently strikes a pedestrian. In the city a motorist is obligated to maintain a lookout for pedestrians at crosswalks at all times. If he fails to see a pedestrian in a position of peril when he should have, the motorist is at fault and is responsible. A motorist who could have avoided injury to a pedestrian by the exercise of care which is reasonable under the circumstances is at fault, and is responsible. The motorist cannot escape liability by proving that the pedestrian, admittedly in peril because of his own negligence, could have avoided injury more quickly than the motorist. The operator of a motor vehicle, a dangerous instrumentality, has the constant duty to watch out for the possible negligent acts of pedestrians and avoid injuring them. A higher standard of care than that required of pedestrians is imposed upon the *76 motorist commensurate with the hazards his conduct inflicts upon the public safety. Therefore, he should not be able to escape responsibility for injury to the pedestrian by pleading the latter's negligence. And since, in such case, a plaintiff's contributory negligence will not bar his recovery, the last clear chance doctrine, used to avoid the harsh effects of the contributory negligence defense, is not at issue." (356 So.2d 400, 406).
There are no crosswalks in Haughton. However, when the accident is on a street in a municipality in daylight with kids admittedly walking up and down by the side of the street the rules of Baumgartner would apply:
"We agree with plaintiff that Baumgartner does not appear to be limited to pedestrians at crosswalks." Widcamp v. State Farm Mutual Automobile Insurance Co., 381 So.2d 937, 941; also see Hryhorchuk v. Smith, 379 So.2d 281 (3rd Cir. 1979) to the same effect.
The Court is of the opinion that Jimmy Mayfield was negligent. The preponderance of evidence indicates that Mayfield took his foot off the brake, without looking forward, and that his truck began rolling toward plaintiff knocking her to the asphalt surface of the street, and then the vehicle ran over her legs.
Applying the set of facts most favorable to the defendant, liability still attaches under the rule of Rottman v. Beverly, 183 La. 947, 165 So. 153 (1936) to the effect that what a motorist can see he must see and in legal contemplation he does in fact see. His failure to see what he could have seen by the exercise of due diligence does not absolve him from liability. Even if Jimmy Mayfield did look before starting forward, he is held to see what he should have seen. The testimony shows that the plaintiff was walking across the street a few feet in front of the Mayfield vehicle. Mayfield is therefore held to have seen plaintiff and is required to have allowed her to pass safely to the other side of the street before starting forward.

DAMAGES
The medical testimony was by deposition and there is no question as to the severity of the injuries sustained by plaintiff. All of the doctors who treated Mrs. Smith and the various lay people testified that she is now an invalid. Mrs. Smith is a retired school teacher who, prior to this accident, was a leading citizen of her community, actively involved in church and civic organizations and described as a vibrant, healthy, active individual.
Following plaintiff's injury, she was hospitalized at Bossier City General Hospital from October 12, 1979 through February 20, 1980, a period of 131 days. The final diagnosis was closed head injury; open comminuted segmental fracture of the right tibia; severe soft tissue injury to the left leg; right brachial plexus injury; and pneumonia. She also underwent the following surgical procedures: thorough irrigation and debridement of the laceration of the left leg as well as open fracture; suture of laceration of left leg and scalp; application of external fixation device for the open segmental fracture of the right tibia and fibula; and split thickness skin graft to the left lower leg.
Plaintiff was next admitted to Bossier City General Hospital on July 25, 1980, and discharged on August 4, 1980, a period of ten days, with a final diagnosis of phlebitis of the right lower leg; old fracture of the right lower extremity; and cerebral ischemia.
Plaintiff was last admitted to Bossier City General Hospital on September 10, 1980, and discharged on September 12, 1980.
Mrs. Emma Pittillo testified that she had been close friends with the plaintiff for in excess of fifty years and that they had attended First Methodist Church together, both being very active in church activities. She further noted that plaintiff was associated with the Eastern Star and held an office in that organization at the time of the accident, as well as being president of the United Daughters of the Confederacy. Mrs. Pittillo described plaintiff's physical *77 condition as being "just great" and "perfect" and further described plaintiff's mental condition prior to the accident as being "great, she couldn't have done all the things she did without that." After noting that plaintiff was unable to take care of herself and really was bedridden most of the time, Mrs. Pittillo described her condition since the accident as, "I would say it is a pathetic completely turn-about situation."
Mrs. Martha Swindle, another long time friend of plaintiff, testified to the same effect.
Mr. Billy Smith and Mr. John D. Garland, Jr., plaintiff's son-in-law, testified that plaintiff could not take care of herself and now spends twenty to twenty-two hours in bed. Similar testimony was given by Mrs. Glendola Nelson, a practical nurse who sat with plaintiff while she was hospitalized and for several months after she returned home.
John Rasmussen served as plaintiff's minister at the First Methodist Church in Haughton for six years just prior to plaintiff's injury. He described her activities in the church as, "extremely active. One of those individuals that was there every time the door opened and always willing to do any sort of volunteer work that was necessary." He described her home as being "immaculate" and her physical condition as being "excellent, remarkable" and her mental condition as being "... very astute, very alert."
Mr. Rasmussen described her physical condition following her discharge from the hospital as, "Well, improved, but certainly nowhere near the physical condition that she experienced prior to the accident or the hospitalization." and her mental condition as, "I'd say that it parallels the physical condition."
James W. Little, Bossier Parish Tax Assessor, stated that he had known plaintiff personally for forty-two years, that she had been a good teacher and that she had actually taught him in the fifth grade and that he had kept in touch with her and her family on a regular basis since that time. He described her physical and mental conditions as, "very active person, very alert, concerned about other people." He noted that she did not have any physical or mental disabilities prior to the accident, but now, "Well, now it appears that she's very limited in her ability to move herself and her speech is very slurred. You have to be very attentive to understand what she is saying."
It was stipulated that were they to testify that Officer Ray Wilson of the Bossier Parish Sheriff's Department, Mr. Billy Montgomery, Assistant Principal at Haughton High School, Mr. Harold Harlan, Principal of Haughton High School, and Mr. Jap Gullatt, Jr., Supervisor of Bossier Parish School Board, would testify in substantial accordance to the testimony of Mr. Little.
In his deposition Dr. J. V. Hendrick testified that he had been plaintiff's personal physician since 1968 and that he would describe her as a healty, white female and that he noted that prior to October 12, 1979, she exhibited no signs of senility.
Dr. C. G. McAlister described plaintiff's initial orthopedic injury as follows:
"Basically from my standpoint she suffered an open segmental fracture of her right tibia and fibula which is the small bone and the open just means it is bone sticking through the skin, comminuted means it is more than one piece and segmental means it is two different levels. It was broken like about two inches away from the knee and the second about three inches from the ankle area.
..."Well, at the time after she was evaluated in regards to her history on her was that she had respiratory arrests twice in the ambulance on the way and she, her orthopedic injuries were really secondary to everything else going on with her head injury.
... "Dr. Long and I both felt she had an injury to her brachial plexus on the right shoulder area. That is the group of nerves coming down through the shoulder area from the neck and this really impaired her as far as use of some crutches on the right plus she didn't want to...

*78 ..."She had difficulty from one of the pins up towards the knee. She was having some purulent type of drainage meaning pus indicating a possible or probable infection."
Dr. McAlister gave a description of the tissue loss due to the injury of her legs:
"Q Now, you actually sutured up cuts that were later covered by the skin graft; is that correct?
A Yes. Well, that's not true. The level of where the suturing was went, from what Dr. Valiulis told me as well as what the nurses told me, just went in the room and basically all the skin and the fat between her knee and ankle just peeled off.
Q Just literally like skinning a deer?
A Shucking a pea out of the pod and the leg was bared."
Dr. McAlister further noted that plaintiff would spend ninety to ninety-five percent of her time in bed or in a wheelchair and that she would even have trouble reading a book because she would have difficulty turning the pages.
Dr. Donald R. Martin was called in by Dr. McAlister on a consult for the pulmonary and respiratory problems which arose during the plaintiff's initial hospitalization. He first saw her on November 18, 1979 and stated that she had difficulty speaking and breathing with some arousal in her chest and probable congestive heart failure. He further noted that she had contracted pneumonia which was a complication of the immobility necessitated by the seriousness of her other injuries. Dr. Martin further noted that she developed a monilia infection in her mouth as well as a bladder infection, both of which were attributed to the continued use of antibiotics which were necessary to hold down other types of infection inherent in the type of injuries which she had received. At the time of her discharge in February, 1980, Dr. Martin noted that there had been some improvement but not a marked change. She could say a few words and could move her arms slightly, but the dilated pupil remained and she had difficulty in walking. Dr. Martin examined plaintiff on December 11, 1980, and noted little improvement.
Dr. Warren Long, neurosurgeon, noted that plaintiff suffered a closed head injury with swelling of her brain and that she was unconscious for a considerable period following the injuries. He stated the tracheal tube was left in longer than desired and this resulted in injured vocal cords. He also noted plaintiff suffered a brachial plexus injury to the fifth and sixth nerve roots.
Dr. Roy M. Fleniken, who specializes in otolargngology, noted that plaintiff had a paralyzed left vocal cord which was attributed to a neural injury that was consistent with a closed head injury as diagnosed by Dr. Long.
Dr. John P. Valiulis, a plastic surgeon, stated that on initial examination, plaintiff was found to have a severe injury to the left lower leg in that the skin and fatty tissue was necrotic, dead. It was necessary to do extensive skin grafting over the entire left lower leg from just below the knee to plaintiff's ankle. Dr. Valiulis described the case of the injury as follows:
"Q What would cause that type of a problem?
A Numerous things can cause that; crushing injury, twisting injuries. It was like a commonly seenlike a wringer injury. The arm sometime is pulled through a wringer, the old wringers in washing machines. And it would take the skin and fat and just twist it off of its underlying structures. Then it would sort of, like, be a loose glove sitting on top of the muscle underneath. And, of course, it would have crushed it, twisted it and separated it from its blood supply. And, of course, also the full thickness skin loss could be caused from burns. It didn't look like that in her case, though. It wasn't a burn scar. But it looked like a de-glovingwhat would be called a de-gloving, which is this wringer-like injury to it."
Dr. Valuilis stated that the scarring would be permanent.
*79 Medical expenses incurred by plaintiff through December 4, 1980 are as follows:

Bossier City General Hospital
10/12/79 through 2/20/80 $39,322.10
Bossier City General Hospital
7/25/80 through 8/4/80 1,600.60
Bossier City General Hospital
9/10/80 through 9/12/80 431.95
Private Duty Nurses  through
12/4/80 31,753.12
Home Health Care 4,754.29
Dr. Clinton McAlister
(Orthopedic Surgeon) 2,362.00
Dr. Warren Long 1,085.00
Dr. Roy M. Fleniken 35.00
Dr. Michael Ellis 125.00
Ambulance Service 353.50
Prescriptions 419.00
Dr. D. R. Martin 1,240.00
Associated Pathology 38.35
Dr. John P. Valiulis 1,560.00
Snell's Limbs and Braces 433.50
Abbet Medical Mart 12.55
P & S Shoe Clinic, Inc. 63.00
Ear, Nose and Throat Associates 35.00
 __________
 $85,623.96

Additionally, Dr. Melvin W. Harju, expert economist, calculated the present value as of January 1, 1981, of expected medical care cost expenses to be incurred on behalf of plaintiff.
The Court will not go into detail as to the method of computation utilized by Dr. Harju. He computed her expectant life as of January 1, 1981 at 10.3 years based on the United States Department of Health, Education and Welfare Vital Statistics of the United States, 1977 Vol. 2, Section 5, Life Tables. He projected that annual cost of private duty nursing was $20,475.00 and to generate that sum, together with medical care inflation, it would take a present award of $206,441.00. Using the same method he also calculated nursing home ICFI care, which was stated to be $9,716.28 per year, and ICFU, which was stated to be $7,737.96 per year.
Considering the medical testimony as to the condition of Mrs. Smith, her hospital record (Exhibit P-1) showing her date of birth to be 9/17/03 and hence under LSA-R.S. 47:2405 as amended by Act 440 of 1976, she would have a life expectancy of 5.88 years, the Court is of the opinion that she is entitled to $50,000.00 for future medical expenses.
Plaintiff is entitled to special damages in the amount of $135,623.96.
The injuries to plaintiff have maimed her for life. She expressed the desire to die to her friends. Her age does not give her much life expectancy but the quality of that life is forfeited.
The Court is of the opinion that plaintiff is entitled to general damages in the amount of $100,000.00.
The Court is of the opinion that there should be judgment herein in favor of Mary G. Smith, plaintiff, and against Charles E. Mayfield, defendant, in the sum of $235,623.96, together with legal interest thereon from judicial demand and all costs of the main demand.
Defendant Millers Mutual Fire Insurance Company of Texas should be cast solidarily with Mayfield in the amount of its policy limits, i.e. $100,000.00, with interest thereon and costs.
The fees of the doctors who testified by deposition are fixed as follows:

 Dr. J. V. Hendrick $100.00
 Dr. John P. Valiulis 100.00
 Dr. Roy Murl Fleniken 100.00
 Dr. C. G. McAlister 125.00
 Dr. Warren Long, M.D. 100.00
 Dr. Donald R. Martin 125.00

and taxed as costs herein.
The charges of the Court Reporters for taking the above depositions are fixed in accordance with their statements filed into evidence and are taxed as costs herein.
The fee of Melvin W. Harju, expert economist, is fixed at $500.00 and taxed as costs.

THE THIRD PARTY DEMAND
The third party demand in this case was brought by Charles E. Mayfield, individually and as the administrator of the estate of his minor son, James W. Mayfield, hereinafter referred to as "Mayfield", against his former insurance agent, Mortimer J. Lasseigne, *80 Jr., hereinafter referred to as "Lasseigne". All of Lasseigne's actions were within the course and scope of his employment with Paramount Agency, Inc., likewise named a third party defendant. By supplemental and amending third party demand the errors and omissions insurer of Paramount Agency, Inc., National Union Fire Insurance Company of Pittsburgh, Pennsylvania, was named a third party defendant. National Union had issued a policy with limits of $1,000,000.00 per person and $300,000.00 per occurrence.
The allegations of the third party petition are that Lasseigne was negligent in not suggesting to Mayfield prior to the accident that he obtain "far higher" liability limits for his automobiles than he had ($100,000.00 per person, $300,000.00 per accident and $25,000 property damage (100/300/25) as shown by Exhibit P. Mayfield 20), in failing to inform Mayfield that combined single limits could have been obtained in 1978 and 1979 under the business auto policy form, and in telling him in 1978 a $1,000,000.00 umbrella policy could not be obtained for him. All of these allegations are denied by Lasseigne and Paramount.
Lasseigne and Mayfield had a passing relationship beginning in the 1960s. However, no professional relationship existed between the two until approximately 1971 when Mayfield came to Lasseigne to obtain his automobile insurance. Mayfield at the time had a policy with limits of $5,000.00 per person and $10,000.00 per accident for bodily injury and $5,000.00 property damage liability limits (5/10/5). Lasseigne obtained for him a policy of insurance with limits of 10/20/10. That policy was renewed each year until 1974.
Lasseigne testified that in 1974 he recommended to Mayfield a "package" policy containing not only automobile liability insurance, but general liability insurance as well. The policy limit was $300,000.00 per occurrence. This limit is often referred to as a "combined single limit", meaning the limit is not divided per person, and there is no separate property damage limit, instead the company will pay $300,000.00 per occurrence and will pay that amount to any one person or group of persons and whether or not their injuries are in the nature of personal or bodily injuries or property damage. Thus, at the suggestion of Lasseigne, Mayfield for the first time had general liability insurance providing coverage to him for any liability to which he might be exposed in the operation of his business. Lasseigne stated that one of the reasons that he recommended this policy was the excellent premium. Lasseigne testified that he recommended a combined single limit of $500,000.00, but that Mayfield selected $300,000.00. Travelers ceased to write this type of policy the next year.
Lasseigne further testified that at his suggestion, and through his efforts, Mayfield was issued a policy of workmen's compensation insurance for that same year, September, 1974September, 1975. That in 1975 he recommended to Mayfield that he obtain automobile liability insurance with limits of $250,000.00 per person and $500,000.00 per occurrence (250/500/25), that he obtain general liability insurance and that he obtain a policy of workmen's compensation insurance. Mayfield asked Lasseigne to obtain for him an auto policy with liability limits not of 250/500, but with limits of $100,000.00 per person and $300,000.00 per occurrence (100/300/25), and that was done. Lasseigne testified that Mayfield declined to obtain general liability insurance or workmen's compensation insurance. He said Mayfield informed him that all of his employees were family members and, therefore, workmen's compensation insurance was not necessary.
When the automobile policy came up for renewal in September of 1976 Lasseigne testified he talked to Mayfield by phone and inquired as to whether or not Mayfield wanted to increase his limits. He testified he did not, after 1975 when he suggested 250/500 and Mayfield selected 100/300, suggest any particular dollar amount and he made no direct quotations because Mayfield was not interested in increasing his limits.
Lasseigne testified that Mayfield was premium conscious. He said that he talked *81 by telephone or in person to Mayfield in August or September of each year to see if any changes were desired in the policies.
Mayfield contends that he relied "100 per cent" on Lasseigne. Mayfield denied having any knowledge that in 1974 to 1975 he had a package policy containing auto liability limits of $300,000.00 and general liability limits of $300,000.00. He further denied that in 1975 Lasseigne recommended that he obtain auto liability limits of 250/500 and denied that Lasseigne at any time, other than 1974, suggested that he increase his auto liability limits. Mayfield contends that he thought in 1975 he had $300,000.00 liability and continued to think that after the switch to Millers.
Pages 486-492 of the record contain important testimony of Mr. Mayfield under cross-examination:
"Q Okay, All right. Now, this policy here, Mr. Mayfield, according to what it indicates has several different coverages in it and it may be referred to as a package policy.
A Okay.
Q Were you ever aware that you had a package policy?
A I never heard that term before.
Q Okay, you were aware though, I take it, that you had the workman's compensation coverage from 1974 till '75?
A Now, is that through
Q Through September of '75 through Mr. Lasseigne?
A Yes, Yes.
Q All right, and you were aware that you had property damage insurance?
A Yes.
Q You were aware that you had general liability?
A No.
Q You weren't aware of that?
A No general liability, no.
Q You never saw this policy, because if you had seen it, you would have seen the general liability checked wouldn't you?
A I did not know I had general liability.
Q Okay, and you were aware that you had auto, but you thought it was with another policy and you thought this was your equipment policy?
A Correct.
Q All right now, in 1975 this policy expired and Mr. Lasseigne got no more insurance for you through Travelers, did he?
A That is correct.
Q All right now, at the time that that policy expired, what insurance did Mr. Lasseigne suggest to you that you buy?
A At that time, he told me that he was changing from Travelers to Millers as far ashe said, I'll have you the same coverage
Q Well, Mr. Mayfield my question is
A Okay.
Q What insurance did Mr. Lasseigne suggest to you that you purchase in September of 1975 when he did not get a renewal of the Travelers policy?
A There was no suggestion made. He said, I
Q No suggestion?
A No suggestion. He said I am changing from Travelers to Millers.
Q Okay. No discussion of whether you should have manufactures and contractors liability?
A No sir.
Q No discussion as to whether you should have general liability?
A That is correct.
Q No discussion as to whether you should have automobile liability?
A That is correct.
Q No discussion as to what limits of automobile liability you should have?
A Said it would be the same.
Q Be the same?
A Correct.
Q And what did you assume that to be?
A Three hundred thousand on my liability.
*82 Q Well, Mr. Mayfield you told us awhile ago you never knew you had the three hundred thousand. How could you assume you would have the same?
A I had three hundred thousand liability through the policy with Travelers through Mr. Lasseigne. He said when I'm changing frim (sic) Travelers to Millers, I'll have you the same coverage.
Q All right now, are you telling us right now, Mr. Mayfield, that in 1975 you thought you had three hundred thousand dollars worth of insurance?
A Liability insurance, yes.
Q All right. How were your limits broken down, tell me that?
A Okay, it was first one hundred, was my recollection.
Q And what was the
A And, let me see, the first figure was, to my recollection was, one hundred, three hundred, one hundred. Since then, I have found out that was incorrect. It was one hundred, three hundred, twenty-five.
Q Okay, that's what you thought you had in 1975?
A In '76.
Q Well, what aboutfrom 1974 till 1975, you thought your limits were one hundred
A No sir, I had three hundred thousand dollar liability. Now, as far as the other figures, I was not sure of those.
Q And you knew that in 1975, you knew you had three hundred thousand dollars?
A The center figure to my recollection was always liability.
Q Okay, what was the first figure to your recollection?
A As I told you until after all these proceedings started, I did not have any idea what either the first or last figure referred to.
Q Now, Mr. Mayfield, did you tell me at your deposition that the largest limit you had ever had prior to this accident was one hundred, three hundred?
A That is what I told you, yes sir.
Q. Okay. I take it then that you do not consider the three hundred thousand that you are talking about now to be a larger limit than the one hundred, three hundred?
A No sir, I thought that the three hundred figure was the same, that the three hundred was my liability.
Q Okay. All right, now, and it's your testimony that when this policy, the '74 to '75 Travelers policy expired that you assumed that it was all going to be continued just with another company?
A Yes sir.
Q You would have all the same coverage?
A I was told I would have the same coverage with a different company.
Q And you testified a moment ago that every year you got these policies in the mail?
A That is correct.
Q And in 1974 to '75 you got that workman's compensation policy in the mail, you got that policy there in the mail and you got another policy on your autos in the mail?
A Yes.
Q All right, and in 1975 you got what in the mail?
A Any policy he sent me came through the mail, I would take out the invoice, I would write him a check and mail it back to him.
Q Did you get workman's compensation coverage in 1975?
A Now that I'm not sure of.
Q Did you get
A I don't believe I did in 1975.
Q Did you get general liability coverage in 1975?
A Not to my knowledge.
Q Okay. Did you ask for it?
A No sir.
Q When did you ask for general liability coverage?
A In 1978.
*83 Q Had Mr. Lasseigne suggested it to you before?
A No sir.
Q Never have?
A Never.
Q Did not suggest it to you in 1977?
A No sir.
Q Did you call Mr. Lasseigne in 1977 with reference to an injury to an employee?
A I believe that was in '76 that I called him, in the latter part of '76, to my knowledge that I called him.
Q Okay. And did you discover that you did not have workman's compensation?
A That is correct.
Q Did you obtain workman's compensation at that time?
A Yes.
Q Did Mr. Lasseigne suggest to you at that time that you obtain general liability insurance?
A No sir.
Q Did he obtain a quote for you?
A Not to my knowledge.
Q Did Mr. Lasseigne ever at anytime suggest to you that you needed more automobile liability insurance coverage than you had?
A Only when we increased it, which would have been back at the time of the Travelers policy.
Q From ten twenty to the three hundred?
A Correct.
Q And itlet me make sure I understand. Your belief is or your impression was that from 1974 on you had the same coverage?
A Yes sir, with the exception of when I requested and received this general liability policy which was an additional one hundred thousand.
Q Okay, but I'm talking about your auto coverage?
A Well, I thought that was auto coverage. That was general liability.
Q All right, you thought it was auto?
A Yes sir, on the very front page of the policy it stated auto coverage.
Q. Let me show you this. I'll write 3-D number two, and this maywell, if you don't recognize it, will have it identified by Mr. Lasseigne. Ask you if that's that general liability policy that you are talking about?
A Could I get Mr. Achee to look at it?
Q No, I want to know what you think about it.
A Yes sir.
Q That's the policy
A Thison the very front corner it says, general liability automobile.
Q It says general liability, dash, automobile, isn't that right?
A Yes.
Q Mr. Mayfield do you every look at anything other than the upper left hand corner when you look at an insurance policy?
A I only look at the head lines.
Q Okay, thatwe know that now. All right.
A Great.
Q What premiums are shown on that policy Mr. Mayfield?
A It shows two thousand dollars, but I paid two thousand seventy-five for it.
Q Well, Mr. Mayfield my question is very simply
A Yes.
Q What premium is shown and what are they shown to be for?
A It shows two thousand dollars right there.
Q All right. And it says coverage part numbers, coverage parts, manufactures and contractors liability insurance, is that correct? Is that what it says right there Mr. Mayfield?
A Yes sir, but on the other side it says automobile physical damage insurance.
Q Is there any coverage listed for automobile physical damage insurance?
A It's on the same line.
MR. TUTT: I want to introduce this as 3-D number 2.
*84 MR. ACHEE: No objection.
THE COURT: Let the offering identified as 3-D number 2 be received.
Q Mr. Mayfield, at the time we took your deposition in September of 1980, did you testify that atas of that date, you did not know whether you had a combined or a single limit policy?
A That is correct.
Q As of that date
A As of that date.
Q September 25, 1980?
A That is correct.
Q That means that you didn't know what the limits of your present coverage in September of 1980 were, is that right?
A That is correct.
Mr. Mayfield contends that when this suit was filed he believed that he had $300,000 coverage for this accident under the automobile fleet policy and an additional $100,000 under a manufacturer's and contractor's policy which policy was issued by Paramount and contained the words "General LiabilityAutomobile" on the first page. He told his personal attorney the limits as he understood them. However, when his attorney contacted Mr. Alex Smith, Jr. he was informed of Mayfield's actual coverage and was advised to increase his liability coverage.
Mayfield testified that in 1978 he requested Lasseigne to obtain for him an umbrella policy with $1,000,000.00 limits. Lasseigne denied that the request was ever made. Mayfield testified that the request was made in the presence of Mr. Wayne Wicker. Mr. Wicker is in the oil business and has an umbrella policy with a $5,000,000.00 limit. Mr. Wicker remembers eating lunch with Mayfield and Lasseigne on occasions, sometimes once a month, but he couldn't recall any specifics of any conversation.
The issue is one of credibility. Mr. Mayfield attended UCLA and graduated with a degree in geology from Centenary College and has been successful in the oil business for some time. He stated that he didn't read his insurance policies. The evidence shows each policy was mailed and the premium paid. There is no reason why he could not tell what limits he had. He has not proven that he ever asked for more than he received or that Lasseigne ever gave him reason to believe that he had more or any different coverage than that requested.
The question remaining is whether Mr. Lasseigne had a duty to advise Mr. Mayfield that his liability limits were insufficient and whether the excess exposure of Mr. Mayfield in this lawsuit is a result of that breach of duty.
Counsel have filed excellent but lengthy briefs herein.
The thrust of third party plaintiff's argument is that Mr. Mayfield had a growing successful business; that Mr. Lasseigne was a Chartered Property and Casualty Underwriter (CPCU); that the National Association of Insurance Agents, Inc. (NAIA) has adopted a code of ethics to which more than fifty agents, including Paramount, subscribed in the yellow pages of the January, 1978 and January, 1979 Shreveport Telephone Directory; and that as a CPCU, Lasseigne was considered a highly qualified expert in the insurance field and that he had a duty to bring Mr. Mayfield's policy up-to-date with respect to monetary limits and new forms of coverage available.
Third party plaintiff relies on an article in the Insurance Counsel Journal and a Drake Law Review article as projecting the duty of seeing that when an insured's operations are expanding, care should be taken to see that limits are raised accordingly and the possible liability for failure to so do.
No case in this state or in any other state has been cited as holding that an insurance agent has a duty to recommend to an insured that he increase his personal liability limits.
The only issue heretofore sanctioned in Louisiana in actions between agents and their insureds is: What did the insured want, what did he ask for and did he get it?
In Karam v. St. Paul Fire and Marine Insurance Company, 281 So.2d 728 (La.1973) *85 cited by both parties, the Court said at page 730-731:
"An insurance agent who undertakes to procure insurance for another owes an obligation to his client to use reasonable diligence in attempting to place the insurance requested and to notify the client promptly if he has failed to obtain the requested insurance. The client may recover from the agent the loss he sustains as a result of the agent's failure to procure the desired coverage if the actions of the agent warranted an assumption by the client that he was properly insured in the amount of the desired coverage."
Kiernan v. Commercial Union Insurance Company of New York, 271 So.2d 889 (La. App. 4th Cir. 1973) is a case relied upon heavily by the Supreme Court in the Karam decision and the holding therein is essentially identical to that of the Karam case:
"An insurance agent is responsible to his client to use reasonable diligence in attempting to place requested insurance and can be held liable if his actions warrant a reasonable assumption on the part of the insured that the insured is covered when, in fact, he is not."
The Court went on, however, to place the blame for the failure of the insured to be covered on the insured for not reading his policy. The Kiernan case involved a situation wherein the insured had in force a $25,000.00 liability policy which was to be renewed. The insurer informed the agent it would not insure one of the drivers of one of the vehicles for more than $5,000.00. The policy was subsequently issued and the agent wrote to the insured advising them that the $5,000.00 limitation applied whenever the son was driving the car. She neglected to advise them that the policy endorsement actually limited the coverage to $5,000.00 when any male under the age of 25 was driving the car. The insureds had not informed the agent that the family vehicles were used in the insureds' business as well as for personal use and subsequent to that time a male employee of the insured under the age of 25 was involved in an accident causing considerable damage. The insured sought to recover the difference between the $5,000.00 coverage available and the $25,000.00 which they thought to have been available from the agent. The Court cited the rule of the Karam case that a prospective insured may recover loss sustained as a result of the agent's failure to procure the desired coverage when the agent's actions warrant an assumption by the insured that he was suitably covered.
The Court went on to state, however, that "The burden of proof is on the plaintiff to show the defendant agent agreed to provide the coverage." The Court cited Arceneaux v. Bellard, 149 So.2d 444 (La.App. 3rd Cir. 1963). The Court went on to find that there was no negligence or fault on the part of the agent and, to the contrary, the fault lay with the insureds for not telling the agent the cars were used in the family business and "... in not reading the clear provisions of their policy." Kiernan v. Commercial Union Insurance Company of New York, supra, at page 892.
There was no action on the part of Lasseigne proven at trial which would have justified Mayfield in reasonably assuming he was covered to the extent of $300,000.00.
A restatement of the law is found in the Second Circuit case of Porter v. Utica Mutual Insurance Company, 357 So.2d 1234 (La.App. 2nd Cir. 1978), at page 1238 which reads as follows:
"In order to recover for loss arising out of the failure of an insurance agent to obtain insurance coverage, the plaintiff must prove: (1) an undertaking or agreement by the insurance agent to procure insurance; (2) failure of the agent to use reasonable diligence in attempting to place the insurance and failure to notify the client promptly if he has failed to obtain the insurance; and (3) the actions of the agent warranted an assumption by the client that he was properly insured."
The Second Circuit restated this rule this year in Redmond v. National Union Fire Insurance Company, 403 So.2d 810.
None of these circumstances exist in this case.
Third party defendants in their brief state that they have no quarrel with most of the authorities cited and statements *86 therein that were cited by third party plaintiffs, but point out that they still cite a rule of law similar to the Karam holding.
Mayfield also cites for his position Fiorentino v. Travelers Insurance Company, 448 F.Supp. 1364 (1978) wherein the United States District Court for the Eastern District of Pennsylvania said:
"When the insured informs the agent of his insurance needs and the agent's conduct permits a reasonable inference that he was highly skilled in this area, the insured's reliance on the agent to obtain the coverage that he represented that he will obtain is justifiable."
The agent did not obtain the coverage he said he would.
Third party plaintiff cites Grant v. Touro Infirmary, et al., 223 So.2d 148 (La.1969) and Louisiana Title Insurance Company v. Cary Hodges & Associates, Inc., et al., 358 So.2d 964 (1st Cir. 1978) for his contention that expert testimony would not be required to show what Lasseigne's duty was.
In Grant a surgeon left a sponge in a patient and in Louisiana Title a surveyor wrongfully located a drainage structure. The apparent negligence in those cases is not at all like this case where the question is: What is adequate insurance coverage for Mayfield?
Third party defendant states in his brief that the jurisprudence of the entire United States has been combed by way of computer and that this cause of action has been attempted to be asserted but one time and that was in Fleming v. Torrey, 273 N.W.2d 169 (S.Ct. of South Dakota, 1978) where the Court rejected the argument and held as follows:
"For the purposes of our opinion we assume that plaintiff Fleming relied on defendant, had confidence in him and would likely follow his advice on insurance matters. But where the insured did not request the agent's advice as to liability limits but instead ordered specific limits; where the subject involved is a money limit rather than a more complex policy provision; and where there is no special relationship beyond that shown here, we cannot find a legal duty upon the agent to volunteer advice regarding liability limits for the breach of which the agent could become liable for $107,500.00.3"
The footnote to the paragraph reads as follows:
"There is no one right answer to the question of what is a `safe' liability limit on a truck. Many factors enter in at the time of the accident that cannot be known in advance. The `safe' limit on property damage on property owned by an insured, for instance, is quite a different matter."
No case has been cited that places a duty on an agent to advise what limits should be carried. Homeowners' limits and equipment coverage is different for what ought to be in place in those areas can be ascertained. This Court cannot say what is a safe liability coverage.
The Court is of the opinion that the demands of third party plaintiff should be denied at his cost.
Counsel for plaintiff Mary G. Smith will prepare a judgment in accordance with this opinion and present it to the Court for signature.
Benton, Louisiana, this 7 day of December, 1981.