JOHNSON, Justice.[1]
liWe granted this writ application to determine whether the lower courts erred in finding that an insurance broker or agent has an affirmative duty to advise a client as to amounts of insurance coverage. The Fourth Circuit’s plurality affirmed the trial court’s ruling that J. Everett Eaves, Inc., breached its duty to properly explain the components of the Business Income and Extra Expense (“BI & EE”) insurance coverage, and by failing to do so, the client was unable to make an informed choice regarding coverage. Isidore Newman School v. J. Everett Eaves, Inc., 08-1368 (La.App. 4 Cir. 8/5/09), 17 So.3d 465. For the reasons that follow, we hold that the insurance agent/broker had no duty to recommend coverage amounts or to determine whether the client is underinsured; rather the client had a duty to determine the amounts of coverage needed and to review the policy upon receipt to determine that those needs are met, and thus, we reverse the lower courts’ rulings.

\ .FACTS AND PROCEDURAL HISTORY

Cornelius “Hap” Crusel (“Crusel”), an insurance broker with J. Everett Eaves, Inc. (“Eaves”),[2] sold property and casualty insurance to Isidore Newman School (“Newman”) from 1989 until 2005. Every year, Crusel provided a written “Insurance Proposal” when he met with Newman’s business managers to discuss coverages and renew the policy. From 1989 until 2000, Newman’s business manager was Martin Macdiarmid; from October 2000-October 2003, it was R. Leigh Barker; and from 2004-2006, it was Fred Drew. Particularly, in 2004, Fred Drew (“Drew”) was appointed as Newman’s Chief Financial Officer (“CFO”). In the Petition for Damages, Newman stated that Drew was Newman’s authorized representative, who met with Crusel to discuss Newman’s insurance policies, i.e., coverages, terms and conditions of those policies. From 1989 until 1999, Newman purchased $250,000 of coverage, entitled “Extra Expense Coverage.” In 1999, the designation was changed from “Extra Expense Coverage” to “Business Income & Extra Expense Coverage,” but Newman retained the same coverage of $250,000. On July 1, 2003, the coverage under the policy was increased from $250,000 to $350,000.
The record demonstrates that June 29, 2005, was the last time Crusel met with Drew to issue his insurance proposal. Drew testified that when Crusel explained the BI & EE coverage, Crusel stated that *354 it protected the school against the extra expenses the school would incur while repairing physical damages to the school buildings. Crusel gave the example that the policy would cover expenses for trailers on the football field should the school buildings be damaged and unusable.
Following Hurricane Katrina, on August 29, 2005, Newman School suffered major damage to its physical structure, which caused the school to be closed for over Ijjtwo months. As a result, Newman suffered a very substantial loss of tuition revenue/income for the school year 2005-2006, totaling approximately $3,166,606.00.
Thereafter, on May 22, 2006, Newman filed suit against Eaves and Westport (hereinafter referred to collectively as “Eaves”), alleging that Crusel, Eaves’ Chief Executive Officer (“CEO”), was negligent in failing to advise the school that the BI & EE coverage covered income/tuition losses and that amount was not sufficient to cover tuition losses, and in misleading the school into believing that the BI & EE coverage was limited to physical damages to buildings. Specifically, in the Petition for Damages, Newman argued that:
19.
Eaves had a duty to exercise reasonable skill, care, and diligence in evaluating Newman’s insurance needs, advising Newman as to level of insurance coverage it required, and procuring that requisite coverage. Eaves also had a duty to inform Newman of the different coverage options that were available to it and to explain the costs and potential benefits of those coverages.
Newman also argued that Eaves held itself out as an insurance professional that voluntarily assumed a duty to provide accurate and complete information about the scope of the coverage recommended. Newman maintained that had it been properly informed that the BI & EE coverage included tuition loss, it would have increased its coverage.[3]
| ¿Newman further argued that it was justified in relying on Eaves’ assertions of the meaning of the BI & EE coverage because the policy was over 400 pages in length, and was quite complicated and difficult to understand. Newman noted that the policy’s complexity is displayed with the definition of “operations,” which includes “business activities that generate *355 tuition and related fees from students,” but nothing spells out whether “operations” are covered or what is the significance of the definition. Newman maintained that the BI & EE coverage form referencing coverage for Business Income, defines “business income” as “Net Profits.” Newman reasoned that because it is a nonprofit institution, it is clear to see why Newman missed the significance of the definition of “business income.” According to Newman’s expert, Ron Wanglin, schools typically do not associate “business income” with tuition revenue.
In response to the suit, Eaves filed a Motion for Summary Judgment, arguing that Newman had a legal duty to be aware of the amount of coverage, and if that limit was insufficient, then Newman had the obligation to adjust the limits to meet the school’s needs should the school close, and as a result, suffer a loss. Eaves maintained that the amount of coverage was plainly listed on both the written proposals and the policy of insurance presented annually. The trial court denied Eaves’ Motion for Summary Judgment, finding that there was an issue of material fact as to whether Eaves failed to properly advise Newman regarding the coverage options and the amount of the coverage needed.
After a trial on the merits, the trial court found that Eaves last met with Drew in June 2005 and issued his last insurance proposal on June 29, 2005. The trial court found that both of these acts were within a year of the filing of the May 22, 2006, | Jawsuit. Therefore, the trial court held that the claim was not perempted.
The trial court also found that Eaves breached his duty of care required of an insurance broker by not explaining the components of the BI & EE coverage so that Newman could make an informed choice regarding this coverage, and by not including in his annual recommendations of suggested coverage a sum to cover the loss of tuition. The trial court further found that Newman was not justified in relying solely on Eaves’ advice and that Drew failed to uphold his duty to read or review the policy. Thus, the trial court awarded damages totaling $8,166,606.00, plus interest and costs, but also determined Newman was 70% at fault, comparatively.
In a plurality opinion, the court of appeal found no error in the trial court’s ruling. Particularly, the court of appeal found that Eaves assumed a duty to provide recommendations on the scope and amount of insurance coverage that Newman should purchase. By failing to adequately inform their client regarding options, Eaves breached its duty to the client. The court of appeal also found that because Eaves’ last meeting with Drew and the issuance of the insurance proposal took place in June of 2005, within one year of the suit being filed, the claim was not perempted. The court of appeal added that Eaves’ meetings with the business managers, annually, were more than mere renewals.
In dissent, Judge Bonin pointed out that Newman was a sophisticated client. The Newman Board of Directors included two insurance executives and at least one attorney. In 2000, in response to business manager Baker’s query whether the BI & EE coverage should be increased, Eaves drafted and submitted to Baker a written proposal to increase the amount of coverage, but Newman declined the offer. Further, the insurance proposal last submitted by Eaves included a summary page for coverages which showed that the BI & EE coverage was included with $350,000 limits. In the summary for this coverage, it showed that “Tuition & Fees” |6were “Included” in the BI & EE coverage. Judge Bonin noted that Drew testified that he did not read this document, but only *356 placed it in a binder in his files. Drew also testified that after Hurricane Katrina, he read the policy for the first time, and instantly, understood the consequences for the school. Judge Bonin concluded that Newman, unaided by its insurance broker, was quite capable of evaluating its exposure to tuition income loss due to a catastrophic event. Judge Bonin was of the view that Eaves’ trailer example, was just that, an example of coverage, and was not “a voluntary undertaking to explain the entire policy.”
Eaves filed a writ of certiorari, and this Court granted the writ application. Isidore Newman School v. J. Everett Eaves, Inc., 09-2161 (La.12/18/09), 23 So.3d 950.

DISCUSSION

The issue before this Court is whether the insurance broker or agent owed a duty to a client to provide recommendations on the scope and amount of property and casualty insurance coverage that the school should procure, and whether the insurance broker or agent, in this instance, owed a duty to explain the components of the existing policy, which clearly informed Newman that the business income and extra expense (BI & EE) coverage was designed to encompass the loss of tuition revenue. We note that where there is an agreement to procure insurance, the duty of the broker is analogous to the duty of the agent. Crayton v. Sentry Ins. Co., 612 So.2d 767, 771 (La.App. 1st Cir.1993).
This Court in Karam v. St. Paul Fire & Marine Insurance Co., 281 So.2d 728, 730-31 (La.1973), stated:
An insurance agent who undertakes to procure insurance for another owes an obligation to his client to use reasonable diligence in attempting to place the insurance requested and to notify the client promptly if he has failed to obtain the requested insurance. The client may recover from the agent the loss he sustains as a result of the agent’s failure to |7procure the desired coverage if the actions of the agent warranted an assumption by the client that he was properly insured in the amount of the desired coverage.
In Karam, after a hot water heater exploded damaging Karam’s laundromat, he sued his insurance agent for failing to procure property damage liability insurance and coverage in the amount requested of $100,000. At the trial, the agent admitted that the client requested coverage in the amount of $100,000, that he intended to procure $100,000 in insurance coverage, but through his error, he only procured $10,000. The trial court ruled in favor of the insured, finding the agent negligent in failing to procure coverage in the requested amount of $100,000. The court of appeal affirmed the trial court’s ruling. This Court affirmed, and held that where the insured had requested the limits of property damage liability coverage, and where the agent intended to procure the $100,000 of coverage, but procured only $10,000 coverage through error on his part, the agent is liable to the insured.
In the wake of Karam, this Court maintained that an insurance agent owes a duty of “reasonable diligence” to his customer. Roger v. Dufrene, 613 So.2d 947, 949 (La.1993). This duty of “reasonable diligence” is fulfilled when the agent procures the insurance requested. Karam, supra. Jurisprudence has suggested that an insured has a valid claim against the agent when the insured demonstrates that: “1) the insurance agent agreed to procure the insurance; 2) the agent failed to use ‘reasonable diligence’ in attempting to procure the insurance and failed to notify the client promptly that the agent did not obtain insurance and 3) the agent acted in *357 such a way that the client could assume he was insured.” Id.
There are several state and federal cases in Louisiana which have considered the duty owed to the insured by an insurance agent. In Smith v. Millers Mutual Ins. Co., 419 So.2d 59 (La.App. 2 Cir.1982), the Second Circuit Court of Appeal found no authority for the proposition that an insurance agent has a duty to recommend to |8an insured that he increase his personal liability limits. In Graves v. State Farm Mutual Auto Ins. Co., 01-1248 (La.App. 3 Cir. 6/26/02), 821 So.2d 769, the Third Circuit Court of Appeal held that the insurance agent had no affirmative duty to inquire into the client’s financial condition and make recommendations about higher auto liability coverage, or that the client purchase an umbrella policy; the only duty imposed on the agent is to obtain the coverage requested by the customer. In Zinsel Co. v. J. Everett Eaves, Inc., 99-691 (La.App. 5 Cir. 11/30/99), 749 So.2d 798, the Fifth Circuit Court of Appeal determined that any duty the agent had to notify his client of the availability of increased limits was satisfied by the agent’s letter to the insured.
In City Blueprint & Supply Co., Inc. v. Bob Boggio, et al, 08-1093 (La.App. 4 Cir. 12/17/08), 3 So.3d 62, the insured’s building sustained damage from the flooding associated with Hurricane Katrina. The insured sued its insurance agent, alleging that the agent had always assured them that they were “fully covered” and the hazard/fire policy in force, covered the property against flood damage. The insured filed suit against the insurance agent arguing “claims of negligence, ... breach of fiduciary duty, failure to obtain flood coverage, failure to advise regarding flood insurance options and availability, ... and failure to institute a policy whereby all agents would advise client regarding flood coverage.” Id. at 64. The insurance agent filed a Motion for Summary Judgment arguing that no duty was owed to advise the clients regarding flood coverage. The trial court granted the motion and dismissed the insured’s claims. The court of appeal affirmed the trial court’s ruling, holding that the agency and agent did not breach a duty owed to the client by failing to advise the client about flood insurance options. Particularly, the Fourth Circuit Court of Appeal held that absent a specific question from the insured, an agent has no duty to advise a client that it is underinsured, and furthermore, that “[a]n insured |flis responsible for reading his policy and is presumed to know its terms.” Id. at 66-67.
Similarly, in Heidingsfelder v. Hibernia Insurance, L.L.C., 09-0753 (La.App. 4 Cir. 11/18/09), 25 So.3d 976, the Fourth Circuit declined to impose a duty on an agent to identify a client’s coverage needs or to advise the client that he was underin-sured. The Fourth Circuit recognized that an insurance agent does not have an “independent duty” to spontaneously advise insureds regarding various insurance options. As in City Blueprint, the Fourth Circuit held that no agreement existed between the plaintiff and Hibernia Agency to procure flood insurance coverage for contents. Hence, the agency did not breach a duty to the plaintiffs by failing to procure flood insurance coverage for contents.
The federal district courts have also considered an agent’s duty to his client and determined that an agent has no duty to independently assess the needs of the insured and recommend coverage; instead, the insured is responsible for communicating his insurance needs, and reading the policy of insurance, upon receipt. See, Cameron Parish School Bd. v. State Farm Fire and Cas. Co., 560 F.Supp.2d 485 (W.D.La.5/19/08).
*358 In Dobson v. Allstate, 06-0252, 06-1097, 06-1064, 06-1255, 06-1734, 06-1585, 2006 WL 2078423 (E.D.La.7/21/06), the plaintiffs alleged that their agent failed to advise them that they were underinsured. There was nothing in the record to indicate that the Plaintiffs specifically inquired about a particular type, or amount of coverage. The court found that the agent had no duty to “spontaneously identify a client’s needs and advise him as to whether he is underinsured or carries the correct type of coverage.” Id. The court noted that Louisiana does not impose a duty on an agent to identify a client’s needs and assess what type and amount of coverage would sufficiently meet the client’s needs. See, Whitehead v. State Farm Ins. Co., 06-8115, 2006 WL 3747520 (E.D.La.12/15/06). The courts have held that it is the client’s | ^responsibility or duty, not the agent, to determine the amount of coverage needed and advise the agent of those needs, and upon receiving the policy of insurance, the client has a duty to review the policy to make certain his needs are met. See, Frischhertz v. Lexington Ins. Co., 06-5676, 2006 WL 3228385, (E.D.La.11/3/06). The courts have noted that “the ‘advice’ that an agent had an affirmative duty to give the insured” involved “aspects of the policies ... that were not within the knowledge generally held by a lay person,” i.e., “the agent’s specific knowledge of the insured’s individual situation triggered that duty to disclose.” See, Parker v. Lexington, 06-4156, 2006 WL 3328041 (E.D.La.2006).
In the case sub judice, the record demonstrates that in 2000, Eaves presented a written Insurance Proposal to Newman with the BI & EE coverage amounts increased from $250,000 to either $500,000 at an annual cost of $999 or $750,000 at an annual cost of $2000. Newman rejected this proposal, but three years later, in 2003, chose to increase the coverage to $350,000. There is no evidence in the record to suggest that Newman intended to purchase the additional coverage necessary to protect itself against the tuition income losses. Also, there is no evidence presented to suggest that as an insurance professional, Eaves voluntarily assumed a duty beyond acting with reasonable diligence to explain each provision of a clearly written insurance policy that delineates that “tuition and fees” are included in the BI & EE coverage. As the CFO of the school, Drew was required to at least review the coverages and premiums of the policy when he met with Eaves on an annual basis. Instead, Drew testified that upon receipt of the policy, he filed the document, but failed to review or read the policy. His testimony was that when he finally read the insurance policy after Hurricane Katrina, he immediately understood the BI & EE coverage and the $350,000 limit, and immediately realized that Newman was grossly underinsured for the extraordinary loss of tuition income caused by the hurricane. As Instated in City Blueprint, supra, and Heidingsfelder, supra, it is not the agent’s responsibility to advise a client that it is underinsured; instead, it is well settled that the necessary coverages are best determined and calculated by the insured, who is charged with the primary responsibility to “read the policy.” City Blueprint, 3 So.3d at 67. Stated differently, Newman was in a far better position than Eaves, the insurance broker, to calculate its potential business income losses, including, the loss of tuition income, should the school close, unexpectedly.[4] The facts alleged do not suggest that Eaves had any way of knowing the school’s potential loss of business income.
*359 Regarding Newman’s argument that due to the complexity of the insurance policy, it was not informed that tuition losses were covered by the policy, we note that being a private school, tuition is the school’s primary business income. The record demonstrates that the 2003 proposal, as well as all subsequent annual Insurance Proposals provided to Newman, expressed the following:
BUSINESS INCOME & EXTRA EXPENSE COVERAGE LIMITS
Business Income and Extra Expense (BI & EE) Blanket Limit $350,000
* * ⅜
BI & EE-Tuition & Fees Included
The above language refutes Newman’s argument that it was not aware that the Business Income coverage included loss of tuition, as it is clearly written. A review or reading of the proposals would have alerted the business manager/CFO that tuition was included, in that category, and that the school was underinsured. It is clear that Drew did not read the insurance proposal or the policy, prior to the loss, because both would have informed him that tuition was included in the BI & EE coverage.
We note that in the present case, Newman is not alleging that it was misled into believing that it had coverage that it did not have, nor that Newman was told that their |12desired coverage was unavailable. Newman, in fact, refused additional coverage at an increased cost. Simply put, Newman never requested coverage for BI & EE in an amount that would cover its tuition losses. There is no evidence that Eaves lead Newman to believe that it procured any other BI & EE coverage other than the $350,000 as requested by Newman obtained.

CONCLUSION

After considering the record and jurisprudence, we conclude that the lower courts erred in holding that the insurance broker or agent owed a duty to advise the client as to the amount of insurance coverage to obtain. An agent has a duty of “reasonable diligence” to advise the client, but this duty has not been expanded to include the obligation to advise whether the client has procured the correct amount or type of insurance coverage. It is the insured’s responsibility to request the type of insurance coverage, and the amount of coverage needed. It is not the agent’s obligation to spontaneously or affirmatively identify the scope or the amount of insurance coverage the client needs. It is also well settled that it is insured’s obligation to read the policy when received, since the insured is deemed to know the policy contents.
For the foregoing reasons, we conclude Defendant did not breach a duty owed to Newman. This finding pretermits any discussion of whether this matter was per-empted under LSA-R.S. 9:5606.
REVERSED.
GUIDRY, J., concurs and assigns reasons.
VICTORY, J., concurs in the result.

. Retired Judge Philip C. Ciaccio, assigned as Justice ad hoc, sitting for Chief Justice Catherine D. Kimball.

. According to the Petition for Damages, "Eaves is a full service insurance center,” and Westport Insurance Corporation ("Westport”) was Eaves’ errors and omissions insurer.

. In support of its argument, Newman cited Harrington v. Lexington Insurance Co., 06-1440, 2006 WL 2192853 (E.D.La.8/1/06), which held that an agent has a duty to provide the insured with correct information, otherwise the agent may be liable for negligent misrepresentation. This case can be easily distinguished from the case at bar. In Harrington, the Plaintiffs argued that the Defendants failed to inform them about an exclusion for water damage in the policy, and thus, the agent was liable for deliberate misrepresentation of the policy's terms. The Plaintiffs argued that they never received a copy of the policy or notice of any exclusions therein. In the case at bar, it is undisputed that Newman received a copy of the terms of the policy and a written proposal, which clearly spelled out that "tuition and fees” were included in the BI & EE. The Plaintiffs also cited Venture Associates Inc. of Louisiana v. Transportation Underwriters of Louisiana, 93-539 (La.App. 3 Cir. 3/2/94), 634 So.2d 4, which held that an agent has a duty to provide accurate information and could be liable for negligent misrepresentation. In Venture, the agent "provided erroneous information to prospective insurers and underwriters as to the nature and extent of maritime work involved in Venture's business.” The present case does not fall within the four comers of the holding in Venture. In the present case, there is no evidence that Eaves presented any erroneous information concerning the nature or extent of Newman's business. Therefore, both Hanington and Venture are inapplicable to the case at hand.

. The court in Parker, supra, held that the amount of coverage needed or desired is a matter peculiarly within the insured's knowledge.